IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ACTUARIAL CONSULTING SERVICES, INC. | ) ) ) | Case No. 4:24cv60 |
| Movant, | ) ) | |
| v. | ) ) | |
| BLUE CROSS AND BLUE SHIELD ASSOCIATION, and THE KRAFT HEINZ COMPANY, | ) ) ) ) | |
| Respondents. | ) ) | |

**ACTUARIAL CONSULTING SERVICES, INC.'S BRIEF IN SUPPORT OF MOTION TO QUASH OR MODIFY SUBPOENA, AND FOR PROTECTIVE ORDER**

PREPARED & SUBMITTED BY:

John M. Walker, #23250
David A. Changstrom, #26518
LAMSON DUGAN & MURRAY LLP
10306 Regency Parkway Drive
Omaha, NE 68114
T: (402) 397-7300 | F: (402) 397-7824
jwalker@ldmlaw.com
dchangstrom@ldmlaw.com
*ATTORNEYS FOR MOVANT*
*ACTUARIAL CONSULTING SERVICES, INC.*

COMES NOW Movant Actuarial Consulting Services, Inc. ("ACS") and submits this brief in support of its motion to quash or modify subpoena, and for protective order pursuant to Fed. R. Civ. P. 45 in connection with the subpoenas issued by Respondent Blue Cross and Blue Shield Association ("BCBSA") and Respondent The Kraft Heinz Company ("Kraft Heinz"). For the reasons stated below, ACS asks that the Court quash or modify BCBSA's and Kraft Heinz's subpoenas, and issue a protective order.

## INTRODUCTION

Federal courts are not in the business of putting small businesses out of business. Yet through the federal courts' subpoena power, ACS is subject to a demand to produce documents that might do exactly that. To be clear, ACS is not a party to any current litigation. Despite this, ACS is being commanded to review and catalog what it estimates to be approximately 188,000 documents filled with trade secrets and confidential information, and many of which are subject to at least one non-disclosure agreement—a task that could take hundreds of hours to perform.

ACS is a company with three employees that, combined, have a capacity to work 6,240 hours per year. It is unreasonable to demand that ACS divert hundreds of these hours to perform the legwork in other parties' litigation—particularly when this litigation features, on one side, dozens of Fortune 500 companies, and, on the other side, an association of health insurers that boasts over 100 million members.

The Court has broad powers to protect ACS from this burden. It can order BCBSA to narrow the scope of its request. It can order BCBSA to obtain these materials from other sources—such as from those that are actually parties to the suit. And if what BCBSA has subpoenaed is of critical importance enough to justify its demand, the Court has the power to direct that ACS be fairly compensated for the costs imposed by its compliance.

# FACTUAL BACKGROUND

This action is a very small part of three large anti-trust suits that are proceeding in the United States District Court for the Northern District of Alabama: *Alaska Air Grp., Inc. et al. v. Anthem, Inc. et al.*, No. 2:21-cv-1209 ("*Alaska Air*");[1] *JetBlue Airways Corp., et al. v. Anthem, Inc., et al.*, No. 2:22-cv-558; and *Bed Bath & Beyond Inc. et al. v. Anthem, Inc. et al.*, No. 2:22-cv-1256.

The defendants in the underlying litigation are BCBSA and the insurance companies that make up BCBSA's ownership and membership. (Underlying Complaint, Doc. 2-3, ¶¶ 143-268.) The plaintiffs are purchasers of insurance and insurance-related administrative services. (*Id.* at ¶¶ 10-142.) In the litigation, the plaintiffs are referred to as "National Accounts", as they are each large, multi-site employers that typically seek coverage or services for greater than 5,000 employees. (*Id.* at ¶¶ 269-276.)

The complaints in the underlying litigation allege that the defendants illegally conspired to restrict competition among the entities from whom the National Accounts purchase insurance and insurance-related administrative services. (*Id.* at ¶ 277.) In particular, the complaints allege the defendants have "agreed to allocate customers and markets, restrict output, and eliminate the ability of the Defendant Insurance Companies to compete against each other for the business of National Accounts." (*Id.*)

ACS is a small business in Omaha, Nebraska, that performs actuarial consulting services. (McCoy Dec., Doc. 2-1, ¶ 3.) On November 30, 2023, ACS received a subpoena from BCBSA. (Changstrom Dec., Doc. 2-2, ¶ 3.) The subpoena came with a letter, which stated that ACS had been identified in discovery in the underlying actions as a "broker, consultant, or agent," the

---

[1] The factual background that follows is largely taken from the amended complaint in this action, a copy of which is attached to this filing as Exhibit C.

plaintiffs "have used to procure insurance products." (BCBSA Subpoena, Doc. 2-4, 1.) The subpoena itself seeks 23 categories of documents. (*Id.* at 3, 5-9.) Considered together, these categories contemplate the production of nearly every communication exchanged with or regarding any plaintiff, and any document produced for any plaintiff, from February 1, 2008, through the present. (*See id.*) The subpoena then demanded that ACS complete its production by December 19, 2023. (*Id.* at 1.)

ACS sent counsel for BCBSA an objection letter on December 12, 2023, pursuant to Fed. R. Civ. P. 45(d)(2)(B). (Changstrom Dec., Doc. 2-2, ¶ 4.) The letter noted that the subpoena's scope could very well encompass tens of thousands of documents, each of which would have to be reviewed for privilege, for whether they contain protected material, and for whether they contain ACS's proprietary information or trade secrets. (Dec. 12, 2023, Letter to BCBSA, Doc. 2-5.) ACS and BCBSA then conducted a call on December 21, 2023, to discuss ACS's objections to the subpoena. (Changstrom Dec., Doc. 2-2, ¶ 5.)

On January 18, 2024, ACS received another subpoena and letter—this time from Kraft Heinz, one of the plaintiffs to the underlying actions. (Kraft Heinz Subpoena, Doc. 2-6.) This subpoena asserted one demand, "[a]ll documents requested in the subpoena served on you by counsel representing Defendant Blue Cross Blue Shield Association. . . .," and requested that ACS make its production by January 31, 2024. (*See id.*) On January 25, 2024, ACS sent counsel for Kraft Heinz an objection letter pursuant to Rule 45(d)(2)(B) that outlined its preliminary objections and explained the burden that compliance would impose on ACS. (Jan. 25, 2024, Letter to Kraft Heinz, Doc. 2-7.) That same day, ACS sent counsel for BCBSA an additional letter that contained substantially the same information it gave Kraft Heinz. (Jan. 25, 2024, Letter to BCBSA, Doc. 2-8.) Counsel for ACS and Kraft Heinz conducted a phone call to

confer regarding the scope of Kraft Heinz's subpoena on January 30, 2024, in which Kraft Heinz's counsel stated that its subpoena only sought what will be produced to BCBSA. (Changstrom Dec., Doc. 2-2, ¶ 8.) Counsel for ACS followed this with another call with counsel for BCBSA on February 12, 2024, in which the parties discussed but did not reach agreement as to the scope of BCBSA's subpoena. (*Id.* at ¶ 9.)

To develop an estimate of the potential burden posed by BCBSA's subpoena (and, for practical purposes, Kraft Heinz's subpoena as well), ACS has performed a review of its document management system, its search capabilities, and of the potentially responsive documents it possesses. (McCoy Dec., Doc. 2-1, ¶ 4.) BCBSA's subpoena contemplates a production of both ACS's client files, as well as of ACS's email correspondence. (BCBSA Subpoena, Doc. 2-4.) Of ACS's ~250,000 client data files, ~41,000 can be associated with a plaintiff to the underlying actions. (McCoy Dec., Doc. 2-1, ¶ 5.) ACS's three employees have exchanged ~147,000 emails since 2008—the date back to which the subpoena demands ACS's production. (*Id.* at ¶ 6.) ACS's ability to search these emails is limited to the tools provided by Microsoft Outlook, and simply searching for the term "Conagra" would likely not identify all responsive emails. (*Id.* at ¶ 7.)

At this point, ACS has undertaken substantial efforts to negotiate regarding the scope and burdens associated with the subpoena's demands. (*See* Changstrom Dec., Doc. 2-2, ¶¶ 3-10.) Unfortunately, the undersigned believes that ACS and BCBSA will not reach agreement regarding the proper scope of BCBSA's subpoena. (*Id.* at ¶ 11.) And even if ACS could reach agreement with BCBSA on the scope, BCBSA and Kraft Heinz disagree on who should pay ACS's costs. (*Id.* at ¶ 10.) Therefore, ACS believes it had no choice but to bring this action.

Because ACS has received a subpoena from both BCBSA and Kraft Heinz, it joins both to this action. However, because Kraft Heinz's subpoena asks only for what is produced to BCBSA, it is BCBSA's subpoena that defines the scope of the task demanded of ACS. Therefore, though this motion and brief discuss ACS's request that both subpoenas be quashed and modified, and that a protective order be issued, ACS refers to the two subpoenas as a singular set of demands, the scope of which is defined BCBSA.

## LEGAL STANDARD

Rule 45 governs the exercise of the subpoena power and sets forth standards that guide its exercise. "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). "Non-party subpoenas are subject to the relevancy requirement as discovery from parties in a case." *Scottsdale Ins. v. Am. Re-Insurance Co.*, No. 8:06-cv-16, 2007 U.S. Dist. LEXIS 7845, *7 (D. Neb. Feb. 2, 2007). When challenged, "the proponent of discovery must make some threshold showing of relevance . . . before parties are required to open wide the doors of discovery. . . ." *Nit Wang v. Neb. Pub. Power Dist. (NPPD)*, 4:13-cv-3161, *6 (D. Neb. Oct. 24, 2014). "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case." *Scottsdale Ins.*, 2007 U.S. Dist. LEXIS 7845 at *8.

Rule 45(d) provides the framework under which a subpoenaed party can seek the court's protection:

> On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
>
> (i) fails to allow a reasonable time to comply;

> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45(d)(3)(A). A court can also quash or modify a subpoena when it requires that a party "disclos[e] a trade secret or other confidential research, development, or commercial information. . . ." Fed. R. Civ. P. 45(d)(3)(B). Where a party that issues a subpoena fails to avoid imposing undue burden or expense on a person subject to a subpoena, the court where compliance is required may award the subpoenaed party's lost earnings, attorney's fees, and reasonable compensation. Fed. R. Civ. P. 45(d)(1), (d)(3)(C).

## ARGUMENT

### A. Documents Should First Be Sought From Parties to the Litigation

First, the Court should direct BCBSA to comply with its duty to avoid imposing burden and expense on ACS, a non-party. As noted above, the subpoena seeks documents from two sources: (1) emails and other communications by ACS; and (2) documents that are saved in ACS's client directory. But the subpoena seeks communications that were made with those that are party to the underlying litigation. And if a plaintiff relied on ACS's work product in a way that is relevant to the claims and defenses at stake in the underlying litigation, that plaintiff would only have relied on the work ACS placed in that plaintiff's hands. Therefore, one way BCBSA could avoid this extraordinary burden the subpoena imposes would be to first seek those documents from those that are actually party to the litigation.

## 1. The Subpoena's Demand for Emails Should be Quashed

The subpoena's primary threatened burden is that ACS will be forced to search through all of its emails dating back to February 1, 2008. Of the subpoena's 23 categories, 17 demand the production of ACS's email correspondence:

3. All Documents and Communications relating to any Plaintiff's consideration of whether to purchase or renew a Commercial Health Insurance and/or Administrative Services product. . . .

4. All Documents and Communications relating to any Plaintiff's consideration of alternatives to Blue Plan Commercial Health Insurance and/or Administrative Services product. . . .

5. All Documents and Communications relating to any Plaintiff's consideration of switching from a Blue Plan Commercial Health Insurance and/or Administrative Services product to a non-Blue Plan Commercial Health Insurance and/or Administrative Services product, or vice versa. . . .

6. All Documents and Communications relating to any Plaintiff's consideration of switching from a Blue Plan Commercial Health Insurance product to a Blue Plan Administrative Services product, or vice versa. . . .

7. All Documents and Communications relating to any Plaintiff's actual or potential modification of the terms of a Commercial Health Insurance and/or Administrative Services product agreement.

8. All Documents and Communications relating to any Plaintiff's satisfaction or dissatisfaction with the Commercial Health Insurance and/or Administrative Services products. . . .

10. All Documents and Communications relating to any contract, arrangement, or agreement entered between any Plaintiff and any provider of health care services with respect to rates, discounts, or pricing arrangements.

11. All Documents and Communications relating to the geographic distribution of any Plaintiff's Participants. . . .

12. All Communications with any Commercial Health Insurer, Third-Party Administrator . . . and any Documents provided to You by those entities, relating to the provision of any Commercial Health Insurance and/or Administrative Services product to any Plaintiff. . . .

13. All Documents and Communications discussing or comparing premium equivalents, Administrative Service Fees, provider network size and/or quality, claims costs and claims cost savings, Benefit Design, utilization rates, service, contract terms, total Employer-Sponsored Health Plan costs,

> or any other measure of price and/or quality of Commercial Health Insurance and/or Administrative Services products. . . .
>
> 14. All Documents and Communications discussing or comparing Administrative Services offered by Commercial Health Insurers versus Administrative Services offered by Third-Party Administrators. . . .
>
> 15. All Documents and Communications relating to Your review of claims data, including any analyses, summaries, reports, or presentations that You performed as part of Your work to assist any Plaintiff's consideration, evaluation, selection or purchase of any Health Insurance and/or Administrative Services product. . . .
>
> 17. All Documents and Communications relating to any Plaintiff's decision to purchase any Stop-Loss Insurance product. . . .
>
> 19. All Documents and Communications . . . prepared for or at the direction of any Plaintiff to assist in or inform any Plaintiff's consideration of, procurement of, decision on, negotiation for and/or modification of any Stop-Loss Insurance product(s).
>
> 20. All Documents or Communications relating to analyses, reports or assessments You created, commissioned, received, or reviewed, concerning competition for the sale of Commercial Health Insurance and Administrative Services products. . . .
>
> 21. All Documents and Communications showing metrics or statistics for any Plaintiff. . . .
>
> 22. All Documents and Communications related or referring to any Plaintiff and the Actions or *In re Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)*, No. 2:13-cv-20000-RDP (N.D. Ala.) (the "MDL"), including any Communications between you and any Plaintiff regarding the Actions and/or the MDL. . . .

(BCBSA Subpoena, Doc. 2-4, 10-14.)

Indeed, ACS could have many emails from the previous 16 years that it exchanged with at least one plaintiff to the underlying actions. But where documents are available from a litigant, a third-party such as ACS should not have to bear the burden of producing those documents. *See, e.g.*, *Gen. Parts Distrib., LLC v. Perry*, No. 12-cv-93, 2013 U.S. Dist. LEXIS 89848, *13-14 (D. Minn. June 25, 2013) (overruling objection to Magistrate Judge decision that "where possible," litigant was proper source of subpoenaed documents, not non-litigant; *Athrex,*

*Inc. v. Parcus Med., LLC*, No. 1:11-cv-107, 2011 U.S. Dist. LEXIS 148555, *6 (S.D. Ind. Dec. 21, 2011) ("A party's ability to obtain documents from a source with which it is litigating is a good reason to forbid it from burdening a non-party with production of those same documents."); *Marco Techs. v. Midkiff*, No. 19-cv-2323, 2020 U.S. Dist. LEXIS 259978, *57 (D. Minn. Dec. 7, 2020) ("concern for the burden on non-parties carries 'special weight in evaluating the balance of competing needs'") (quoting Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2, 197 F.3d 922, 927 (8th Cir. 1999)); *Duong v. Groundhog Enterprises, Inc.*, No. 2:19-cv-1333, 2020 U.S. Dist. LEXIS 76611, *17-18 (C.D. Cal. Feb. 28, 2020) ("In its undue burden inquiry, the Court properly may evaluate whether information requested through a nonparty subpoena is readily available from a party").

Instead of compelling ACS to divert large portions of its business capacity to answer BCBSA's subpoena, the burden should fall on those that are actually party to the suit. *See, e.g.*, *Peoples Nat'l Bank, N.A. v. Mehlman*, No. 4:15-cv-996, 2016 U.S. Dist. LEXIS 74234, *6 (E.D. Mo. June 7, 2016) ("If the party seeking the information can easily obtain the same information without burdening the nonparty, the court will quash the subpoena."); *see also In re CenturyLink Sales Practices & Sec. Litig.*, No. 17-MDL-2795, 2020 U.S. Dist. LEXIS 248595, *15-22 (D. Minn. Oct. 28, 2020) (parsing through discovery requests and quashing portions of subpoena to third-party requesting "discovery that the plaintiffs have obtained or could obtain from the defendants themselves"); *EnviroPak Corp. v. Zenfinity Capital, LLC*, 4:14-cv-754, 2014 U.S. Dist. LEXIS 132499, *9-11 (E.D. Mo. Sept. 22, 2014) (collecting cases reaching same conclusion). And in the Eighth Circuit, courts routinely grant motions to quash in favor of non-parties when the information sought can be obtained from litigants through standard discovery requests. *See*, *e.g.*, *id.*

To the extent ACS has exchanged communications with any plaintiff that would fall into one of these seventeen categories, that plaintiff would also possess those communications. Therefore, ACS respectfully asks that the Court quash these seventeen categories from BCBSA's subpoena.

2. **The Subpoena's Demand for ACS's Client Directory Files Should Be Quashed**

The same arguments support ACS's request that the Court quash or modify the subpoena's demand that seeks documents that would be saved in ACS's client directory. This demand is made in four of the subpoena's categories:

2. All contracts or agreements between You and any Plaintiff relating to work You perform or have performed for Plaintiff with respect to any Commercial Health Insurance and/or Administrative Services product.

9. All Documents, including but not limited to all analyses, presentations, slideshows, recommendations, PowerPoint presentations, reports or summaries, prepared for, at the direction of, shown to or given to any Plaintiff to assist in or inform any Plaintiff's consideration of, evaluation of, procurement of, decision on, negotiation for, management of and/or modification of any Commercial Health I:nsurance and/or Administrative Services product.

16. All contracts or agreements for any Commercial Health Insurance, Administrative Services or Stop-Loss Insurance product, including attachments or exhibits thereto, between any Plaintiff and any Commercial Health Insurer, Third-Party Administrator or Stop-Loss Insurance provider.

18. Documents sufficient to show all Insurers from whom any Plaintiff sought and/or received offers for Stop-Loss Insurance products and for each such Insurer or Third-Party Administrator, the terms, including the price (*e.g.*, premium or premium equivalent) and any discounts (*e.g.*, for bundling with another product), retention value, and dates for the Stop- Loss Insurance product(s) that were offered.

(BCBSA Subpoena, Doc. 2-4, 10-13.)

If ACS has a contract with a plaintiff, so too does that plaintiff. And if ACS has developed work product at a plaintiff's direction, it shared that work with the plaintiff.

Therefore, it is the plaintiff that must make and shoulder the burden of production—not ACS. Accordingly, ACS asks that the Court quash or modify these four categories from the subpoena.

**B.     If Ordered, This Production Will Take a Substantial Amount of Time, and ACS Should Be Compensated under Fed. R. Civ. P. 45(d)(1)**

Second, ACS asks that the Court order that it be paid a reasonable fee to compensate it for the considerable work demanded of ACS. As noted above, complying with the full breadth of the subpoena will require, in ACS's estimation, the review of ~188,000 documents. Of these, ~41,000 are data files saved in a central client directory that can be associated with a plaintiff to the underlying actions. **If** these files can be reviewed at a rate of 60 per hour, review of all ~41,000 would require 683 hours of review. Regarding emails, **if** even 15%[2] of ACS's 147,000 emails bear a plaintiff's name, and **if** those emails can be reviewed and categorized at a rate of 120 per hour, review of those emails will require 183 hours. **If** the remaining 85% of emails that do not bear a plaintiff's name but nonetheless might be responsive can be reviewed at a rate of 300 per hour, that review will take an additional 416 hours.

Unless the subpoena's scope is narrowed, it is a demand for 1,282 hours of ACS's time. ACS is not a large company that can easily find slack in its workforce to accomplish this task. ACS has only three employees. Each employee has the capacity to work 2080 hours per year. Therefore, in effect, subpoena demands that ACS divert over 60% of an employee's output toward answering discovery in a lawsuit ACS is not even party to. And again, these estimates are just that—estimates. Though it is possible ACS will undertake this search and discovery its

---

[2] This proportion is difficult to estimate with ACS's rudimentary email search capabilities, but 15% would be only a slightly lower percentage (16.8%) associated with the quantity of ACS's client data files that are directly associated with one of the plaintiffs (~41,000) out of the overall number of files in ACS's client directory (~250,000).

task is much easier than the estimate it has developed to date, it is also possible that its search will be more demanding.

Rule 45 contemplates that litigants will sometimes issue subpoenas that impose substantial burdens on non-parties. For this, Rule 45(d)(1) authorizes the court where compliance is required to award "lost earnings and reasonable attorney's fees" to the subpoenaed-party. Federal courts are not in the business of putting non-litigants out of business simply because they have been caught up in a lawsuit. If BCBSA insists that ACS must spend hundreds of hours doing the legwork of their discovery process, the Court can and should compensate ACS for its time—both that spent by its employees and by the attorneys it has been forced to retain. *See, e.g.*, *Linlong Americas Inc. v. Horizon Tire, Inc.*, No. 1:15-cv-1240, 2018 U.S. Dist. LEXIS 57777, *13-14 (N.D. Ohio Apr. 4, 2018) (awarding non-party subpoena recipient attorney fees under the lodestar method and cost of production, totaling $39,905); *In re Hornbeam Corp.*, No. 14-cv-24887, 2019 U.S. Dist. LEXIS 179576, *18 (S.D. Fla., Sept. 27, 2019) (awarding subpoenaed party $16,283.51 in attorney fees incurred in answering subpoena); *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 300 F.R.D. 234, 250 n.9 (E.D. Pa. May 15, 2014) (awarding reasonable attorney fees and compensation for production to subpoenaed party).

ACS's employees charge their time at a $300 per hour rate. (McCoy Dec., Doc. 2-1, ¶ 9.) ACS has hired the undersigned's firm to protect ACS's interests and will require the firm to review the documents at issue for responsiveness, privilege, and various applicable protections. Therefore, ACS asks that the Court direct it be paid reasonable compensation for the time its employees have and will spend in answering the subpoena pursuant to Fed. R. Civ. P. 45(d)(1).

ACS also asks that it be compensated for its legal expenses its attorneys incurred to date in objecting to and answering the subpoena, calculated under the lodestar method.

## C. The Court Can Modify the Subpoena to Reduce ACS's Burden

If the Court does not quash the subpoena in its entirety, ACS proposes that the Court can take additional measures to modify the subpoena to reduce the burden imposed on ACS. With Rule 45(d)'s burden-shifting framework in mind, ACS proposes two ways the subpoena's scope can be narrowed.

### 1. The Court Can Modify the Subpoena's Time Period

BCBSA's subpoena seeks documents that date from February 1, 2008, to present—a 16-year span. However, in a footnote, BCBSA alleges it is the plaintiffs in the underlying action—not BCBSA—who are at fault for the subpoena's breadth:

> [1] Although Defendants contend that the appropriate time period for this case is November 2, 2016 through the present, Defendants define the Relevant Period for purposes of this subpoena based on the positions taken by Plaintiffs.

(BCBSA Subpoena, Doc. 2-4, 8.)

To ACS's knowledge, the parties to the underlying action did not litigate on the propriety of the subpoena's scope, from which ACS might be able to infer the entire context behind this reference. But from the underlying suits' dockets, much of which is redacted for non-parties, ACS can glean that these parties have engaged in *substantial* argument regarding how the proper relevant time period must be framed. For example, some of the most recent briefing in the *Alaska Air* docket is on a "Motion for Protective Order Based on the Appropriate Statute of Limitations for Plaintiffs' Claims" by BCBSA. (*See Alaska Air*, Docs. 382, 395.) And there, BCBSA takes the affirmative position that "the earliest Plaintiffs have timely damages claims is fall 2015—not 2008. . . ." (*Alaska Air*, Doc. 382, 14.) Therefore, it is BCBSA's position in

*Alaska Air* that "there is no basis for discovery of pre-2015 data that is relevant only to Plaintiffs' damages claims because Plaintiffs do not have timely damages claims that predate fall 2015." (*Id.* at 10.)

Between the footnote in its subpoena to ACS and its briefing in *Alaska Air*, BCBSA has stated that it believes there is no relevant value in the documents from before 2016 that it demands ACS to produce. Therefore, the Court should modify the subpoena so that it only seeks documents from 2016 to present.

### 2. ACS's Communications Are Not Relevant

ACS is not aware of any rationale that supports the breadth of the subpoena's demands for communications. Many of BCBSA's demands are for "[a]ll Documents and Communications." (BCBSA Subpoena, Doc. 2-4, 5-9.) "Documents" responsive to these categories would be saved in ACS's central client directory—thus part of the ~41,000 documents described above that ACS is likely able to associate with a specific plaintiff to the underlying actions.

But BCBSA's demands also encompass "Communications." (*See id.*) These communications can be placed in one of three categories, those: (1) between ACS and plaintiffs; (2) between ACS and other non-parties; and (3) exchanged within ACS. It is BCBSA's burden to explain the relevance of the documents it seeks. *Nit Wang*, 4:13-cv-3161, at *6. To the extent any of these categories would bear relevance to the underlying actions, it is only the first category that seeks BCBSA's communications with the plaintiffs, as those might bear on the claims and defenses in the underlying litigation. The second and third categories do not involve the litigants, and therefore would not bear relevance. But as argued above, if this first category of documents is indeed relevant, the documents should be discovered from the actual parties to

the litigation rather than placing the cost of discovery on ACS.  *See, e.g.*, *Gen. Parts Distrib., LLC*, 2013 U.S. Dist. LEXIS 89848, at *13-14; *Athrex, Inc.*, 2011 U.S. Dist. LEXIS 148555, at *6; *Marco Techs.*, 2020 U.S. Dist. LEXIS 259978, at *57; *Duong*, 2020 U.S. Dist. LEXIS 76611, at *6-7.  Therefore, ACS asks the Court to modify BCBSA's subpoena so that it does not demand ACS to produce its communications.

        **3.**      **The Court Should Grant ACS Sufficient Time to Produce Documents**

In connection with the arguments above, ACS also asks the Court to suspend ACS's obligation to produce documents until which time the Court decides whether the subpoena should be quashed or modified, and to what extent.  After the Court makes its decision, ACS proposes that it can provide the Court an updated estimate regarding the time ACS expects that its search, review, and production will take, for which ACS can then request an extension of its production deadline commensurate with those demands.

**D.**      **Some Subpoenaed Materials May Be Subject to a Non-Disclosure Agreement**

Last, ACS is aware that some of the subpoenaed materials may be subject to a non-disclosure agreement it has with non-party UnitedHealthcare, which provides that ACS, if called to disclose such material pursuant to legal process, will first give UnitedHealthcare reasonable prior notice so that UnitedHealthcare may seek a protection order or other relief.  (McCoy Dec., Doc. 2-1, ¶ 8.)  ACS has given notice to UnitedHealthcare, but is unsure if it will seek to intervene.

## CONCLUSION

For the reasons stated, above, ACS asks the Court to quash and modify BCBSA's subpoena as particularly described above. ACS also asks that the Court issue an order that extends the deadline by which ACS must complete its production, and directs that ACS be paid its lost earnings and reasonable attorney fees incurred to date and to be incurred in the future in responding to BCBSA's subpoena.

DATED this 14th day of February 2024

ACTUARIAL CONSULTING SERVICES, INC.
Movant,

By:    s/ *David A. Changstrom*
        John M. Walker, #23250
        David A. Changstrom, #26518
        LAMSON, DUGAN & MURRAY, LLP
        10306 Regency Parkway Drive
        Omaha, NE 68114
        T: (402) 397-7300 | F: (402) 397-7824
        jwalker@ldmlaw.com
        dchangstrom@ldmlaw.com
        *ATTORNEYS FOR MOVANT*
        *ACTUARIAL CONSULTING SERVICES, INC.*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with NECivR 7.1(d)(1)(A) and (d)(1)(3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word for Office 365 and contains 5,038 words, which is within the 13,000-word limit.

s/ *David A. Changstrom*

# CERTIFICATE OF SERVICE

   I hereby certify that on February 14, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.  I also sent a copy of the foregoing to the following persons by certified and electronic mailing:

  David H. Korn
  Cravath
  Worldwide Plaza
  825 Eighth Avenue
  New York, NY 10019
  dkorn@cravath.com
  *Attorney for Respondent*
  *Blue Cross and Blue*
  *Shield Association*

  Christopher C. Sabis
  Sherrard Roe Voigt Harbison
  150 3rd Ave. S. #1100
  Nashville, TN 37201
  csabis@svrhlaw.com
  *Attorney for Respondent*
  *The Kraft Heinz Company*

              s/ *David A. Changstrom*